IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

J. CHRISTOPHER KRIVONYAK, et al.,

        Plaintiffs,

v.           CIVIL ACTION NO. 2:09-cv-00549

FIFTH THIRD BANK, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the plaintiffs' Motion to Remand [Docket 12] and the defendants' Motion to Dismiss Count V of Plaintiffs' First Amended Complaint [Docket 6]. For the reasons explained below, the plaintiffs' Motion to Remand is **GRANTED** and this case is hereby **REMANDED** to the Circuit Court of Kanawha County, West Virginia. Due to the remand, the defendants' Motion to Dismiss is **DENIED as moot**.

**I. Background**

On May 4, 2007, the plaintiffs, J. Christopher Krivonyak and Chanin W. Krivonyak, filed a Complaint in the Circuit Court of Kanawha County, West Virginia against the original defendants, Fifth Third Bank, Fifth Third Mortgage Company, Midwest Payment Systems, Inc., and Metz Law Offices, PLLC. (State Court File 5 [Docket 1] (attached to Notice of Removal).) The plaintiffs sought "to recover damages . . . for numerous statutory and common law violations . . . arising out of the [d]efendants' attempts to collect upon a purported consumer debt." (*Id.*) Specifically, the plaintiffs brought claims of strict liability violations of the West Virginia Consumer Credit

Protection Act (Count I), the tort of outrage (Count II), fraud (Count III), defamation (Count IV), and negligence (Count V). (*Id.* at 12-17.) Fifth Third Bank, Fifth Third Mortgage Company, and Fifth Third Processing Solutions, incorrectly identified in the Complaint as Midwest Payment Systems, (collectively, the "Fifth Third Defendants") filed an Answer on June 25, 2007. (*Id.* at 44-54.) On May 1, 2009, the plaintiffs filed a First Amended Complaint which they brought both individually and on behalf of all similarly situated West Virginia borrowers against only the Fifth Third Defendants. (*Id.* at 56-70.) The First Amended Complaint did not amend Counts I through V, which remain as individual claims, but it added a class claim for Breach of Duty of Contractual Good Faith and Fair Dealing (Count VI). (*Id.* at 66-68.)

On May 15, 2009, the Fifth Third Defendants (hereinafter "defendants"), filed a Notice of Removal with this court. (Notice Removal 1 [Docket 1].) The defendants sought removal under the Class Action Fairness Act of 2005 ("CAFA"). Specifically, the defendants argue that this court "has original jurisdiction over the Civil Action pursuant to [CAFA], 28 U.S.C. § 1332(d)(2)(A), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the Civil Action is a class action in which a member of the Class is a citizen of a State different from the defendants." (*Id.* at 2.) The defendants state that, "[a]ccordingly, the Civil Action may be removed to this Court pursuant to 28 U.S.C. § 1446." (*Id.*) The defendants further assert that they are each Ohio corporations with principal places of business in Ohio, while at least one of the class members resides in West Virginia. (*Id.* at 3.) The defendants also assert that while "[t]he First Amended Complaint does not expressly quantify all of the damages that the Putative Class seeks . . . , it is more likely than not that the amount in controversy exceeds [the required] $5,000,000, exclusive of interest and costs." (*Id*.) In support of this assertion, the defendants state that the named

plaintiffs are seeking $4400 in civil penalties alone and that the defendants serviced over 2000 loans in West Virginia between 2006 and 2008. The defendants therefore claim that the plaintiffs are seeking more than $8.8 million in civil penalties. (*Id.* at 4.) Finally, the defendants argue that this case does not fit within the mandatory exceptions to CAFA and, therefore, this court would have original jurisdiction over the class action. (*Id.* at 5-6.)

On June 11, 2009, the plaintiffs filed the pending Motion to Remand. They argue that the defendants "have offered no evidence to establish that this action meets CAFA's jurisdictional threshold of more than 100 class members and more than $5 million in controversy." (Pls.' Mem. Supp. Mot. Remand 1 [Docket 13].) The plaintiffs argue that the First Amended Complaint does not seek penalties for each loan that the defendants originated in West Virginia, but rather "for each occasion the [d]efendants (a) charged more than one late fee for a single late payment, (b) failed to credit payments to borrowers' accounts, and (c) returned an alleged partial payment to borrowers and refused to credit that payment against the amounts due on the borrowers' loans." (*Id.* at 5.) The plaintiffs assert that the defendants "failed to provide any evidence as to the number of times it serviced West Virginia borrowers' loans in this manner." (*Id.*) Accordingly, the plaintiffs argue that "it may be the case that the [d]efendants returned partial payments a handful of times in West Virginia, and charged the illegal late fees a hundred times to only a few borrowers, thus depriving the Court of jurisdiction under CAFA." It is the defendants' burden to show that the court has jurisdiction upon removal and the plaintiffs argue that the case must be remanded because the defendants have failed to meet their burden.

In response, the defendants argue that they have met their burden as set forth in *Strawn v. AT&T Mobility LLC*, 530 F.3d 293 (4th Cir. 2008). (Defs.' Resp. Opp'n Pls.' Mot. Remand 1

[Docket 14].) The defendants emphasize that the class includes "[a]ll consumer borrowers in West Virginia whose loans were serviced by Fifth Third anytime after May 4, 1997[.]" (*Id.* at 3.) Therefore, the defendant argues that the number of more than 2000 loans (in fact, 2201 loans) between 2006 and 2008 does not include all the loans serviced prior to 2006. Specifically, the defendants argue that the class includes more than 100 members, as required by CAFA, because it is made up of *all* West Virginia borrowers whose loans were *serviced* by the defendants after May 4, 1997. (*Id.* at 4.) In addition, the defendants re-assert that the amount in controversy exceeds $5,000,000 because the named plaintiffs are seeking $4400 in civil penalties and with 2201 loans serviced, the plaintiffs are seeking civil penalties of $9,684,400, not including attorneys' fees and costs, which the defendant argues will be significant. (*Id.* at 7-8.) In support of these arguments, the defendants challenge the plaintiffs' assertion that the class is limited to "borrowers charged more than one late fee for a single late payment;" borrowers who the defendants "failed to credit payments to the [specific] accounts; and" borrowers who the defendants "returned alleged partial payment[s] . . . [thus] refusing to credit the payment to the amounts due." (*Id.* at 5.)

The plaintiffs reply that the defendants have failed to meet their burden because they did not provide any information that would help determine the amount in controversy. Specifically, the plaintiffs again argue that the amount in controversy cannot be established by the number of loans serviced. (Pls.' Reply Supp. Mot. Remand 3 [Docket 15].) Furthermore, the plaintiffs argue that attorneys' fees should not be used to calculate the amount in controversy because that amount would be based only on pure speculation. (*Id.*) Finally, the plaintiffs argue for the first time that they are due attorneys' fees because the defendants lacked an objectively reasonable basis for seeking removal of this case. (*Id.* at 3-4.)

In addition, on the same day that the defendants filed the notice of removal in this case, the defendants filed the pending Motion to Dismiss Count V of Plaintiffs' First Amended Complaint. That motion is also ripe for review.

## II. Discussion

Because this court is one of limited jurisdiction, I will address the motion to remand first and, if necessary, address the motion to dismiss. In resolving the pending motion, I am also cognizant that "federal courts, unlike most state courts, are courts of limited jurisdiction, created by Congress with specified jurisdictional requirements and limitations." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). Furthermore, removal statutes must be construed strictly and where federal jurisdiction is doubtful, I must remand. *Id.*; *see Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994).

### A. Legal Standards and Precedent

An action may be removed from state court to federal court if the case could have been brought originally in federal court. 28 U.S.C. § 1441(b). For a case to be brought originally in federal court under the relevant section of CAFA at issue in this case, 28 U.S.C. § 1332(d)(2)(A), it must have: (1) more than $5,000,000 in controversy, exclusive of interest and costs; (2) at least one member of the plaintiffs' class who is a citizen of a state different than at least one of the defendants; and (3) 100 or more class members. 28 U.S.C. §§ 1332(d)(2)(A), (d)(5)(B). The removing party bears the burden of proving that the federal court has jurisdiction over the removed action. *See, e.g.*, *Strawn*, 530 F.3d at 298.

The *Strawn* court addressed a case removed under CAFA and held that "the party seeking to invoke federal jurisdiction must allege it in his notice of removal and, when challenged,

demonstrate the basis for federal jurisdiction." *Id. Strawn* was a class action brought by AT&T customers who alleged that they were improperly charged a $2.99 Roadside Assistance service fee that they never wanted. *Id.* at 294. The complaint defined the purported class as "[A]ll consumers who: (1) purchased [an AT&T Mobility cellular] account in the state of West Virginia; and (2) were charged a $2.99 monthly charge for the Roadside Assistance service without ever requesting or enrolling for said service." *Id.* at 295. In the notice of removal, AT&T attached an affidavit stating that "more than 58,800 AT&T customers, excluding business customers and AT&T employees, remained enrolled in the Roadside Assistance program beyond their initial free trial period and thereby were automatically charged the $2.99 monthly fee." *Id.* AT&T then argued that because the statutory minimum damages were $200, the amount in controversy was at least $11,760,000 and, therefore, well in excess of the required $5,000,000 threshold under CAFA. *Id.*

The plaintiffs in *Strawn* argued that the number of persons in the class was not all people currently enrolled in the Roadside Assistance program, because it should exclude those who willingly remained enrolled in the program. *Id.* at 295-96. The district court then "ordered AT&T to recalculate the estimated class size . . . to 'the more limited scope of the putative class'—the subset consisting of just those customers who did not willingly remain enrolled." *Id.* at 296. After AT&T asserted that it could not possibly calculate such a hypothetical subset, the district court granted the plaintiffs' motion to remand because "the class alleged in the complaint includes only those consumers who were charged a fee without their authorization" and that AT&T could not prove that such a group had an amount in controversy in excess of $5,000,000 because it had no evidence of how many people comprised that group. *Id.*

The Fourth Circuit reversed the district court in *Strawn* on the grounds that the plaintiffs defined the class not as those who were "willing or unwilling to retain the program, but rather as those who 'were not given an option.'" *Id.* at 299. The *Strawn* court relied on the allegation that AT&T made a practice of bundling the program with new cellular service. Furthermore, the court noted that "the complaint challenges the *initial* transaction in which customers were automatically given both telephone service and Roadside Assistance service, even if the customers opted out later after discovering the charge." *Id.* The court then held that "[t]his class definition includes *any* AT&T customer who was charged $2.99 after being automatically enrolled in Roadside Assistance, 'without ever requesting or enrolling for said service.'" *Id.* "The proposed class makes no distinction between automatically-enrolled customers who, upon eventually discovering the $2.99 charge, chose to ratify it and retain the service and those who, upon discovering the charges, became 'unwilling' customers." *Id.* Accordingly, the Fourth Circuit held that AT&T's affidavit established that the matter in controversy exceeded $5,000,000 and, therefore, remand was inappropriate. *Id.*

More recently, the Fourth Circuit addressed another CAFA removal case in an unpublished opinion and held that the removing party failed to satisfy its burden because the estimates of the amount in controversy relied on wholly unsupported assumptions. *See Bartnikowski v. NVR, Inc.*, 307 Fed. Appx. 730 (4th Cir. 2009). In that case, the removing party asserted that the "putative class members will claim to have worked an average of 5 overtime hours per week" and, therefore, the estimated amount in controversy exceeded $5,000,000. *Id.* at 733. The district court "found that [the defendant's] calculations were too speculative and that the record was too bare to allow for a reasonable estimate of the amount in controversy" and because that made federal jurisdiction doubtful, the district court remanded the action. *Id.* The Fourth Circuit affirmed, finding the amount

in controversy estimate "fatally undermined by the wholly unsupported assumption . . . that Plaintiffs and class members will each claim to have worked an average of five hours of overtime per week [where there are] no records of the number of overtime hours worked by class members[.]" *Id.* at 735.

### B. Challenges by the Plaintiffs

The plaintiffs in this case assert in their Motion to Remand that the defendants have not met their burden of establishing that the class includes 100 or more people and that more than $5,000,000 is in controversy. The plaintiffs do admit that the minimal diversity requirements of CAFA are met in this case. The parties agree on the applicable law, but at the heart of the parties' disagreement is exactly who is defined as a member of the class and how that affects the analysis. In order to resolve the motion, I will first look to the definition of the class.

The First Amended Complaint states that it is brought "on behalf of all West Virginia borrowers to prevent the Defendant from needlessly and illegally placing their home loans into default and possible foreclosure by improperly assessing late fees in violation of West Virginia Code § 46A-2-115." (State Court File 56.) In the class claim, the plaintiffs assert that the defendants "(a) charged multiple late fees for a single late payment, (b) failed to credit payments to the Plaintiffs' account, and (c) returned an alleged partial payment and refused to credit it against the amount due." (*Id.* at 66.) The plaintiffs then specifically define the class as "[a]ll consumer borrowers in West Virginia whose loans were serviced by Fifth Third anytime after May 4, 1997." (*Id.* at 67.)

The defendants assert that the class includes many more than 100 members.[1] Even assuming this is true, however, the sheer number of class members alone is not helpful in calculating the amount in controversy. As to the amount in controversy, the defendants assert that the named plaintiffs seek to recover $4400 and, therefore, it is a good estimate of the amount that each member of the class would also seek to recover. The flaw in this reasoning, however, is that the defendants assume that every borrower is a member of the class. There is no evidence, however, that every person whose loans were serviced by the defendants paid any of the challenged fees. The defendants argue that the plaintiffs defined the class as including all consumer borrowers, but the First Amended Complaint must be read as a whole and in doing so it is clear that the class only includes those borrowers who were charged multiple late fees, were not credited payments, or were returned an alleged partial payment. Any borrower who was not charged any of the challenged fees simply could not be a member of the putative class.

The plaintiffs argue that it could be true that only a handful of borrowers incurred late fees and, therefore, the amount in controversy would not reach $5,000,000. I agree. In order to establish that the amount in controversy exceeds $5,000,000, the defendants cannot merely speculate as to the number of borrowers in the class who have actual damages. Rather, the defendants must assert facts in order for the court to find that the amount in controversy exceeds $5,000,000 by a

---

[1] Pursuant to the defendants' affidavit, the defendants originated 2201 first mortgages between 2006 and 2008. Accordingly, because the plaintiffs defined the class as encompassing all consumer borrowers, the defendants argue that each of these 2201 people would be within the class in addition to all consumer borrowers whose loans were serviced by the defendants between May 4, 1997 and 2005. However, the class cannot include members who do not share the same injury, that is, if someone was not charged the fees at issue in this case then they simply cannot be a part of the class. Accordingly, I am unable to determine exactly who makes up the class. Nevertheless, for purposes of this Order, I will assume that the class consists of more than 100 people because the defendants clearly have not met their burden to establish the amount in controversy requirement.

preponderance of the evidence. The defendants actually note that the plaintiffs' allegations regarding who defines the class "may be a damages consideration. . . ." (Defs.' Resp. Pls.' Mot. Remand 6.) While the defendants noted that the plaintiffs' arguments are relevant to damages, they failed to address the argument and instead relied on the flawed premise that each and every borrower is seeking to recover the maximum $4400 in civil penalties. Quite simply, there is no evidence to support this assumption and mere speculation is not enough to carry the burden of proving the amount in controversy. *See Bartnikowski*, 307 Fed. Appx. at 736-37.

The defendant relies on *Strawn* for its argument that it does not have to provide more detailed information in order to meet its burden. This argument fails because *Strawn* is readily distinguishable from the case at hand. In *Strawn*, every member of the putative class paid the service charge, but in this case there is no evidence as to how many people have paid the allegedly wrongful fees. Rather, the defendants' improperly assume that every borrower with a loan has also paid the fees and, therefore, that every borrower suffered the same injury. Furthermore, the *Strawn* court held that AT&T did not have to determine who of those who paid for the service subjectively wanted or did not want the service at issue, but in the pending litigation the defendants are claiming that they do not have to show who in the class was *objectively* charged multiple late fees, were not credited payments, or were returned an alleged partial payment. The two situations are far from analogous and, in fact, the more analogous scenario would be if AT&T had averred that it had some number of customers, but that it could not determine how many of them still carry the service at issue. In other words, AT&T asserted precisely how many people in the class *may* have the damages alleged by the plaintiffs, but the defendants in this case failed to allege what people were charged

a late fee at all and, therefore, *may* have the damages alleged by the plaintiffs. Any estimate of how many people paid the allegedly wrongful fees would be pure speculation.

Taking the plaintiffs' argument to an extreme, it is possible that only the named plaintiffs themselves incurred the alleged injury and the other 2200 borrowers have never made a late payment, were never charged multiple late fees, were properly credited all payments, and never had a partial payment returned. Under that scenario, while the class is defined as still having many more people than 100, the total amount in controversy doesn't even surpass $5000, let alone $5,000,000. On the record before me, it is simply impossible to determine how many people are both within the definition of the class and were damaged in any amount by the alleged unlawful actions of the defendants. Without knowing how many people suffered injury, it is impossible to estimate the amount in controversy.

Despite noting that the plaintiffs' argument "may be a damages consideration[,]" the defendants failed to address that argument in its memorandum and instead argued that attorneys' fees and costs should be added to the amount in controversy because the plaintiffs are seeking attorneys' fees and costs under a West Virginia statute. As the Fourth Circuit stated in *Bartnikowsky*, "[a]t this stage of litigation, however, an estimate of attorneys' fees is pure speculation, and thus, on this record, cannot be used to augment the amount-in-controversy calculation." 307 Fed. Appx. at 736 n.12. Quite simply, without any estimation of what the actual amount in controversy of the regular damages is, there is no way to estimate how much reasonable attorneys' fees would add to that number. Accordingly, I **FIND** that the defendants have not met their burden of showing that the amount in controversy exceeds $5,000,000 by a preponderance of

the evidence. They have therefore not demonstrated that this court has removal jurisdiction under CAFA.

### III. Conclusion

As explained above, I do not believe the defendants have met the requisite burden to prove that this court has jurisdiction. Where, as is the case here, federal jurisdiction is doubtful, I construe the jurisdictional statute narrowly and **FIND** that this court lacks jurisdiction. *See Mulcahey*, 29 F.3d at 151. Accordingly, the plaintiffs' Motion to Remand is **GRANTED** and this case is hereby **REMANDED** to the Circuit Court of Kanawha County, West Virginia. The defendants' Motion to Dismiss is **DENIED as moot**. Furthermore, because I **FIND** that the defendants had an objectively reasonable argument for removal, the plaintiffs' request for attorneys' fees and costs is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party and a certified copy of this Memorandum Opinion and Order to the Clerk of the Circuit Court of Kanawha County, West Virginia.

ENTER: August 4, 2009

Joseph R. Goodwin, Chief Judge